JOSEPH H. WONDERLY v. THE HOLMES LUMBER CO.

*Contract—Preliminary negotiations—Re-sale—Papers in jury room.*

1. Correspondence preliminary to a contract cannot be put in evidence in an action thereon if the contract covers the same ground as the correspondence and is complete in itself.

2. Where a contract of sale is broken by the purchaser, the obligation resting on the seller to reduce the damages as far as possible by a prudent disposition of the merchandise leaves him at liberty to choose any proper mode of disposing it, in his own judgment, provided he uses proper diligence; and he is not obliged to advance money or go to any expense that would not be necessary under any method that he might adopt. And the question whether he has done his duty as to disposing of it is for the jury.

·3. Statements of account by both parties to an action for the breach of a contract of sale may properly be allowed to be taken to the jury room, if the jury desires, subject to objection.

Error to Wayne. (Chipman, J.) Jan. 14.—April 22.

ASSUMPSIT. Defendant brings error. Affirmed.

*Henry M. Campbell* and *Alfred Russell* for appellant.

*Wilkinson & Post* and *Taggart & Wolcott* for appellee, as to the extent and limits of the right of re-sale: 2 Suth. on Dam. 360 ; Sedg. on Dam. (6th ed.) [281] 337; 3 Pars. on Cont. (6th ed.) 208, 210 ; *Whitney v. Boardman* 118 Mass. 242 ; *Pollen v. Le Roy* 30 N. Y. 549 ; *Dustan v. McAndrew* 44 N. Y. 72 ; *Jones v. Marsh* 22 Vt. 144 ; *Pickering v. Bardwell* 21 Wis. 562 ; *Tompkins v. Haas* 2 Penn. St. 74 ; *Brownlee v. Bolton* 44 Mich. 218.

SHERWOOD, J. In August, 1882, the plaintiff, a lumberman residing at Grand Rapids, entered into negotiations with the defendant, a lumber company in Detroit, for the purchase of lumber manufactured and to be manufactured near Stanton, Michigan, which resulted in the execution of a contract by which the defendant purchased from the plaintiff all the white pine lumber which the Wagar Lumber Company had cut for the plaintiff after January 1 of the same

year; also all the lumber which should thereafter be cut for him by said company up to January 1, 1883. The defendant did not take all the lumber cut during said period, and about January 1, 1883, the defendant refused to take any more under the contract, or to make any further payments; and the plaintiff, after giving notice of his purpose hereinafter mentioned, sold the lumber which was not taken by the defendant, and brings this suit for the defendant's alleged breach of the contract, and seeks to recover the difference between the amount which it brought on the sale and the price agreed upon in the contract.

The defendant claims (1) that the contract it made for the purchase of the lumber was based upon certain representations as to the grades and quality of the lumber, upon which the defendant had the right to and did rely, and which were untrue; (2) that in making the sale of the lumber not taken by defendant, plaintiff did not realize all that could have been made out of it, and which it was his duty to do before recovery could be had. The cause was tried in the Superior Court of Detroit before a jury, and the plaintiff recovered $3428.70. Defendant brings error.

The notice attached to the defendant's plea sets up in effect the defense that the plaintiff warranted the grades and qualities of the lumber. The written contract between the parties was preceded by several letters relating to the lumber and price thereof which the defendant desired to purchase, a brief summary of which is as follows:

August 11, 1882, defendant writes to the plaintiff that he has seen the lumber and requests prices by grades. August 16th, the plaintiff writes that he prefers to sell mill-run. August 17th, the defendant writes that he would just as soon buy mill-run as by grades; makes some inquiry as to top logs, grade of logs, and how they were butted in the woods, and concludes: "We want to know just what we will get if logs are same as those being cut now. Send us an estimate of lumber cut and piled to August 15th, by grades." August 18th, the plaintiff writes that the logs are all same as are being cut now, gives approximate amount cut and piled,

promises to get estimate of each grade, and states terms of payment generally. August 19th, the defendant writes arrangements for meeting to conclude contract. August 22d, the plaintiff sends an "estimate of the different grades as piled," in which he gives quantities by grades, in each instance prefixed by the word "about," and takes the further precaution to add that it is "estimate only," and offers to sell the stock at $13 per M., as per his settlement for sawing, and have same loaded on cars; says lumber should be good, as all coarse logs are taken out for shingles. August 23d, the defendant acknowledges receipt of said "estimate;" notices that it covers only 1,500,000 out of 1,700,000 feet sawed, states percentages, and offers $12 per M.; proposes terms of payment; states, "If this is a fair estimate, $12 per M., cash, is all the stock is worth." August 24th, the plaintiff corrects omission in estimate, declines offer of $12, and again offers to sell at $13 for that then on hand, and what shall be cut up to January 1, 1883. August 25th, the defendant notifies the plaintiff of its decision to take lumber now cut and what may be cut up to January 1, 1883, at $13 per M., providing manner of payment as stated August 23d suits, and suggests arrangements to meet and fix up contract and other details.

On the 30th of August, in pursuance of the arrangement for that purpose, the parties met at Grand Rapids, where a contract in writing was entered into for the purchase and sale of the lumber then cut and sawed and afterwards to be cut and sawed previous to the first of January, 1883 (a copy of which will be found in the margin[1]).

---

[1] This agreement, made this thirtieth day of August, A. D. 1882, by and between Joseph H. Wonderly, of Grand Rapids, Michigan, party of the first part, and the Holmes Lumber Company, a manufacturing corporation organized under the laws of the State of Michigan, and having its principal office at Detroit, party of the second part, witnesseth:

(1) That the said party of the first part, in consideration of the sum of five thousand dollars ($5000) to him paid by the said party of the second part, and of the further payments to be made by said party of the second part, as hereinafter provided, hereby agrees to sell unto said party of the second part all of the white pine lumber which has been sawed for him by the Wagar Lumber Company since January 1, A. D. 1882, and all that said last-named company shall saw for him during the remainder of

It appeared on the trial that the amount of lumber which was covered by said contract was 2,456,157 feet. Of this the defendant, prior to January 1, 1883, received 1,010,563 feet. Having paid in the mean time, besides the $5000 down, $9225.71, by the terms of the contract a large sum was payable January 1, 1883, which the defendant refused to pay, and also refused to proceed under the contract. Thereupon plaintiff gave this notice:

" *To the Holmes Lumber Company, Detroit, Mich.:*

" You having defaulted in the payment due me from you, under contract dated August 30, 1882, for the sale and purchase of my lumber cut by the Wagar Lumber Company during the season of 1882, and having refused to further perform said contract, I hereby give you notice that unless

---

the current year, at and for the contract purchase price of thirteen dollars per thousand feet, board measure, mill-run; said lumber shall include all grades of lumber above mill culls.

(2) The final settlement and payment for said lumber shall be made according to the scale made pursuant to the terms of the contract dated December 14, 1880, between said Wonderly and the Wagar Lumber Company, and said scale shall be conclusive upon both parties to this contract in determining the amount of said lumber.

(3) The shingle logs shall be assorted out of the logs hereafter to be manufactured into lumber under the terms of this contract, in like manner as they have been assorted out of the logs from which the said lumber, now cut and in pile, was manufactured.

(4) The said party of the second part hereby agrees to buy all of the said lumber manufactured and to be hereafter manufactured as aforesaid, and to pay therefor at the price of thirteen dollars per thousand feet, board measure, in manner following, viz.: The sum of five thousand dollars ($5000) shall be paid at the execution and delivery of this contract. All lumber shipped by said party of the second part from the first to the fifteenth days of each month, shall be paid for at the aforesaid contract price, upon the twentieth day of the same month; and all lumber shipped by said second party from the sixteenth (16th) to the end of each month, shall be paid for on the fifth day of the next succeeding month, at said contract price. Not more than 230,000 feet, board measure, of said lumber shall be shipped in any one period of 15 days above mentioned, unless, before such further shipment shall be made, said second party shall pay said first party in advance sufficient money to pay for the amount of lumber so to be shipped in excess of 230 M. feet during such 15-day period; the price of such excess of shipment to be $13 per thousand feet, the same as all of said lumber.

(5) It is further agreed that all lumber now sawed and in the yard, or an equal amount of the lumber covered by this contract, shall be shipped out during the year 1882; or, if not shipped within that time, that said amount of lumber, being about 1,800,000 feet, shall be paid for in full on or before January 1, 1883.

(6) It is further agreed that so much of the lumber covered by this contract as shall be manufactured between this date and October 1, 1882,

you forthwith pay at least one-half of the ($12,971.9-100) twelve thousand nine hundred and seventy-one 9-100 dollars that fell due on said contract on the first inst., and come to an immediate settlement, and speedy adjustment and payment of the remainder thereof, I shall proceed to sell the portion of the said lumber still on hand for the best prices I can obtain for it, and credit you with the proceeds thereof, to apply on the amount due and to become due on said contract. If you will make payment and settlement as above stated, all past breaches of said contract, and all claim for damages arising from such breaches, will be waived.

*Dated Grand Rapids, January* 23, 1883."

Plaintiff then proceeded under the notice to sell the lumber which defendant had refused to receive, and sold it nearly all at private sale, realizing therefor $14,621.03, and the value

shall be shipped out by said party of the second part before May 1, 1883; or, if not so shipped, then the same shall be paid for in full on or before the day last mentioned; and it is further agreed that all of said lumber manufactured after October 1, 1882, shall be fully paid for on or before June 1, A. D. 1883.

(7) It is further agreed that the title and ownership of said lumber shall not pass from said Wonderly to said party of the second part, except as the same is shipped out of the mill-yard pursuant to this contract or fully paid for.

(8) It is further agreed that the five thousand dollars ($5000) advance payment heretofore mentioned shall be held by said party of the first part until the final settlement of all matters embraced in this contract; and upon such final settlement said sum ($5000) shall be applied towards the payment of the last four hundred thousand (400,000) feet of said lumber, and any balance still unpaid shall then be paid by said party of the second part to said party of the first part.

(9) It is further agreed that said party of the first part will keep said lumber insured to the amount of $5000 or upwards, for the benefit and protection of said party of the second part, and at his own expense, until the title of the same shall pass to said second party as hereinbefore provided.

(10) It is further agreed that said party of the second part may from time to time give said party of the first part directions in writing concerning the manufacture of said lumber, and that said party of the first part will cause such directions to be observed and followed as far as possible in the sawing of said lumber.

(11) It is further agreed that said party of the second part shall have all of the rights in relation to the loading of said lumber upon the cars that are secured unto said party of the first part by the said contract, dated December 14, 1880, between him and the Wagar Lumber Company.

In witness whereof, the said party of the first part has hereunto set his hand, and the said party of the second part has hereunto signed its name, by its secretary, this thirtieth day of August, A. D. 1882.

JOSEPH H. WONDERLY,
HOLMES LUMBER CO.
By HUGH A. HOLMES, Sec'y.

of that which remained unsold was $549.43. There was a small bill of lumber which defendant had purchased of plaintiff, December 16, 1882, amounting to $100.49, outside of the contract, which was admitted by consent. Including this, plaintiff's loss, as he claimed, from defendant's breach of the contract, aside from all expense of selling the lumber, was, with interest, $3428.70,—the amount of the judgment he recovered. The defendant claims the lumber was not examined by its agents with a view of ascertaining its quality; that what was cut was in piles, so that its quality could not be determined from inspection; that the contract was made on the basis of estimates furnished by plaintiff, and that the defendant expressly relied upon them; that the representations as to quality are all in writing, and were relied upon by defendant; that the representations were of such character as implied knowledge on the part of the plaintiff both as to quality of grades and quantity of the lumber; and that the defendant had a right to rely upon the same, and if the lumber failed to comply with the representation made, then the plaintiff was guilty of false warranty. Defendant also claims that these positions are fully sustained by the preliminary negotiations had by letters which resulted in making the contract sued upon, and that, as explanatory of the contract, they should have been received in evidence.

The plaintiff, on the other hand, claims that the defendant's plea and notice limits the inquiry to the terms of the contract itself; that the preliminary letters form no part of the agreement entered into, and themselves show it was not intended they should; that when they are looked upon in the light of the circumstances under which they were written, they show that all the propositions that were made, as to quality, grades and quantity, were well and carefully guarded; that the plaintiff had declined to treat with the defendant for a sale by grades; that he only gave an opinion as to that which defendant's agent could not see, and which, at most, could only be construed a qualified estimate, and not intended to be definite; and that both parties contemplated the final agreement, when made, should be put in writing, which was

finally done, and this alone must be looked to for the extent and limit of the plaintiff's obligations; that these opinions and indefinite estimates, given under the circumstances they were, cannot be made the basis of a claim of false warranty; that such a construction would be doing violence to the intention of the parties, to the injury of the plaintiff; that the doctrine of caveat emptor applies with full force to such a case; and that all treaties and conversations prior to the making of the contract, and which resulted therein, should be excluded, as merged therein, and the warranty, if any, and whatever its character, must be found in that instrument.

This conflict of views between the parties raises one of the vital questions in the case. By a careful inspection of the contract between the parties it will be discovered there is nothing ambiguous in its meaning or in any of the terms used. It is not a bill of sale simply, but a full and well-completed contract. It also relates to every subject alluded to or treated of in the correspondence between the parties which resulted in the making of the contract. Both of the parties were engaged in the lumber business and trade when the contract was made, and there is nothing in the case showing that either had the opportunity to acquire, or did if he could profit by his superior knowledge of the business in hand or its surroundings. Under such circumstances, to admit the correspondence and treaties had between the parties before they culminated in the contract by which they had agreed to be governed, would not only be a plain violation of the most elementary principles of law and rules of evidence, but also every reason upon which the rules established in such cases are founded.

The two objects to be accomplished in reducing a contract to writing, are (1) to limit the terms of the agreement to what are therein expressed; and (2) to perpetuate the evidence of the existence of the contract,—both of which would be completely frustrated in this case if the preliminary negotiations of the parties, offered by defendant's counsel, had been received in evidence. The ruling of the judge of the Superior Court upon this subject was correct.

In construing the contract the court held, in substance, and charged the jury, that, whatever the product of the sawing of the Wagar Lumber Company was above mill-culls, the defendant was bound to take it, and that it made no difference whether it was of the highest or lowest quality. This charge was excepted to by defendant's counsel. I can see no ground for this exception. I think the construction given is the plainest deduction that can be made from the language used in the contract.

It is said by counsel for defendant that there is nothing said in the contract about the amount of each grade, unless it is implied in the term " mill-run," used in the instrument, and this it is claimed does not cover the subject of grades of lumber so as to exclude a specific warranty thereof, but rather implies the manner of payment. The fact is that the term not only indicates and specifies that the defendant was to take all the grades, save the one excepted out, as they came from the mill, but also that what the lumber came to at the price agreed upon per thousand was to be determined in the same way. Had it been that any warranty as to the quality and amount of the different grades was intended, it certainly would have been put into the contract when the subject was thus so clearly before the parties at the time the contract was made. In that event, of course, the amount, if it had been agreed upon, in each grade would have been stated, and the quality would also have been defined, if a warranty had been intended, in a very different manner. To hold otherwise between the parties to this record, with their business capacity, and experience and familiarity with the lumber trade, would be to assume they were unable to make contracts for themselves required in their trade, and that it is the duty of the courts to exercise a superintending care over their agreements when brought before them, and make them for the parties, when either considered himself aggrieved in his transactions with the other, instead of enforcing them as made. Such is not the rule of law nor of common sense.

Really the record, I think, shows the plaintiff refused to sell by grade, and if so, it precludes all idea of a warranty by

grades as to quality. So far as the logs were to be cut after the making of the contract, there does not appear to be any testimony showing that they did not comply with the contract relating thereto, or with the representations contained in the letters of August 18th and 22d. Witnesses Backus and Swartz were inquired of as to the value of the lumber which was not taken by defendants, and the averages. They seem to have been competent, and I have discovered no error in admitting their testimony.

The ruling of the court as to the manner of sale and diligence necessary to be exercised by the plaintiff in making sale of the lumber which defendant refused to take under the contract, is in different forms made the subject of several objections; none of which, however, I think are well taken. There were several modes of disposing of the lumber left upon the plaintiff's hands by the refusal of the defendant to take it under the contract. Any of these modes would have been entirely proper, and in such case, if the party adopts such as his judgment approves as the best, and uses proper diligence in the mode adopted, no more can be required of him. One thing is quite clear: the plaintiff would not be obliged to incur any expense requiring an advance of money in making sales not absolutely necessary in either of the modes that might be adopted. The question, whether the plaintiff did his duty in making sale of the lumber not taken, was properly submitted to the jury, their verdict is in favor of the plaintiff, and this is final upon the question.

I think the charge of the court was clear upon the points made in the case before the jury, and sufficiently covered all the questions contained in defendant's request to charge, necessary to aid them in coming to a correct conclusion; and no error was committed in refusing to charge the other requests. I do not think the record presents a case in which the rule laid down in *Picard v. McCormick* 11 Mich. 68 is applicable. Neither do I think any error was committed in allowing the jury to take the memorandum to their room when they retired. The rule is undoubtedly as claimed by counsel for the defendants. *Foster's Will* 34 Mich. 21;

*Kalamazoo Novelty Manuf'g Co. v. McAlister* 36 Mich. 327. But this case falls within the exceptions, and no prejudice could have resulted to either side by the course pursued.

After a full and careful investigation of the points made upon the record in this case, I have been unable to discover any error, and the judgment of the Superior Court of Detroit therein should be affirmed.

The other Justices concurred in the result.